1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSEPH DRIES,

                              Plaintiff,

        v.

SPRINKLR, INC.,

                              Defendant.

CASE NO. C20-47-MLP

ORDER

## I.        INTRODUCTION

This matter is before the Court on Defendant Sprinklr, Inc.'s ("Sprinklr") Motion for

Summary Judgment ("Defendant's Motion") seeking to dismiss Plaintiff Joseph Dries' ("Dries")

claims for: (1) disability discrimination (failure to accommodate); (2) wrongful discharge, in

violation of public policy; (3) breach of contract; and (4) violations of the Washington Wage

Payment Act and Wage Rebate Act. (Def.'s Mot. (Dkt. # 35).) Plaintiff opposed the motion (Pl.'s

Resp. (dkt. # 40)) and Defendant filed a reply (Def.'s Reply (dkt. # 43)). The Court heard oral

argument on October 7, 2020. (Dkt. # 51.) Having considered the parties' submissions, oral

argument, the balance of the record, and the governing law, Defendants' Motion (Defs.' Mot.) is

ORDER  - 1

GRANTED in part and DENIED in part, as explained further below.

## II.    BACKGROUND

### A.    Factual Background

On August 30, 2018, Dries accepted the Senior Account Executive position at Sprinklr to manage the sales element of its Microsoft relationship. (Dries Decl. (Dkt. # 42) at ¶ 13, Ex. A at 20-22; Griffin Decl., Ex. A (Dkt. # 36-1) at 17, 20.) Dries previously worked as a Digital Account Executive for Microsoft from August 2007 to December 2014. (Dries Decl. at ¶ 5.) Sprinklr had previously signed a two-year enterprise agreement with Microsoft (the "Microsoft Agreement") that was set to expire in Spring 2020. (Griffin Decl., Ex. A at 22-23, 25; Dries Decl. at ¶ 17.) Sprinklr hired Dries to help ensure the contract would be renewed given his previous employment experience. (Griffin Decl., Ex. A at 23.) In his offer letter, signed on September 13, 2018, Sprinklr agreed to pay Dries a yearly salary of $160,000 and variable compensation in the target range of $160,000. (*Id.*, Ex. A at 17, 20.) At that time, Dries represented he did not have any disabilities. (*Id.*, Ex. A at 80-82, Ex. E at 173-175.)

Dries was promoted to Global Strategic Account Executive at Sprinklr in January 2019. (Griffin Decl., Ex. A at 16; Dries Decl. at ¶ 20, Ex. C at 28.) At that time, Dries reported to then-Director of Sales for the Pacific Northwest Tony Clayton on matters concerning the Microsoft account. (Griffin Decl., Ex. A at 12; Clayton Decl. (Dkt. # 39) at ¶ 4.) Clayton reported to Vice President of Sales for the West Region Joe Eskenazi. (Griffin Decl., Ex. A at 18, 26-27.) Eskenazi reported to Senior Vice President of Sales for the Americas Paul Ohls. (*Id.*)

In early March 2019, Microsoft approached Sprinklr about doing an early renewal of the Agreement in Spring 2019 instead of Spring 2020. (Griffin Decl., Ex. A at 23-25, 28; Clayton Decl. at ¶ 5; Dries Decl. at ¶ 24.) Sprinklr's main point of contact for its business relationship at

Microsoft is Program Manager Tyler Smith, who is the "stakeholder" or "contract owner" for Sprinklr at Microsoft. (Griffin Decl., Ex. A at 28, 34.) Given Microsoft's interest in an early renewal of the Agreement, Dries coordinated with Smith and Clayton from March-May 2019 to put together a revision of the products and services Microsoft would receive from Sprinklr under a new Agreement.[1] (Dries Decl. at ¶¶ 26, 30, Ex. G at 42-76.) One aspect of this revision included a large upsell component, which Dries alleges he primarily handled.[2]

Starting in December 2018, Smith began complaining to Sprinklr about Dries' handling of the Microsoft account. (Clayton Decl. at ¶¶ 6-7; Blankenship Decl. (Dkt. # 38) at ¶ 4.) According to Sprinklr, Smith's complaints generally involved: (1) Smith knowing more about Sprinklr's product than Dries; (2) Dries derailing meetings; (3) Dries failing to expand Sprinklr's presence within Microsoft separate and apart from Smith; and (4) Dries falsely stating in a Sprinklr meeting that Smith saw no value in Sprinklr. (Mara Decl. (Dkt. # 37) at ¶¶ 5-8; Blankenship Decl. at ¶¶ 4-6; Clayton Decl. at ¶¶ 6-11.) Beginning around March-April 2019,

---

[1] Sprinklr alleges Clayton handled the majority of getting the Microsoft deal completed because of Dries' performance issues and Smith's later comments that, but for Clayton, the deal would not have happened altogether. (Clayton Decl. at ¶¶ 6, 10-11.) Dries rebuts that his efforts in getting the deal together, and specifically the upsell portion, are reflected in the real-time updates Dries and his colleagues provided to the sales leadership team and are further corroborated in his Salesforce notations and calendar. (Dries Decl. at ¶¶ 26, 30, 48, Ex. G at 42-76; Tedder Decl., Ex. 1 (Dkt. # 45-1) at 2-64.)

[2] According to Dries, the majority of Microsoft's spend with Sprinklr was previously attributable to two areas: (1) "Software-as-a-Service/Licenses"; and (2) "Services." (Dries Decl. at ¶ 33.) Within "Services," Sprinklr was allegedly focused on two major components: (a) people/hours; and (b) advertising spend through its Sprinklr Ads Portal. (Id.) Dries asserts he pitched Microsoft on the idea it could drastically increase its return on investment by consolidating its social media advertising and marketing through the Sprinklr Ads portal and this aspect of the deal later made it into the final agreement. (Id. at ¶¶ 33, 35.) Per Dries, Clayton did not play a role in pitching the Sprinklr Ads Portal upsell component. (Id. at ¶ 36.)

ORDER - 3

Smith suggested to Sprinklr he wanted Dries removed from the Microsoft account. (Mara Decl. at ¶¶ 6-9; Blankenship Decl. at ¶¶ 7-8; Dries Decl., Ex. I at 80-84.)

On or about March 21, 2019, Sprinklr demoted Clayton's role from Director of Sales to an Account Executive but kept him assisting on the Microsoft account. (Clayton Decl. at ¶¶ 8-9; Blankenship Decl. at ¶ 5; Griffin Decl., Ex. B at 106-107.) Consequently, Dries then began reporting directly to Eskenazi. (*Id.*) By March 2019, Eskenazi determined Dries was not performing to Sprinklr's expectations based on his failure to meet internal sales metrics.[3] (Griffin Decl., Ex. C at 142-144.) On May 7, 2019, Dries attended a review meeting with about twenty members of Sprinklr's sales organization for the Pacific Northwest, including Eskenazi. (Dries Decl. at ¶¶ 37-38.) At the meeting, Eskenazi allegedly verbally berated Dries' colleague Ryan Voss.[4] (*Id.* at ¶ 39.) Dries came to Voss' defense at the meeting and Eskenazi allegedly then turned his anger on Dries. (*Id.*)

On or about, May 14, 2019, Eskenazi learned from Clayton that based on Microsoft's objections to Dries, if Dries "was driving the renewal, it wasn't going to happen." (Griffin Decl., Ex. C at 147.) On May 21, 2019, Dries attended a one-on-one meeting with Eskenazi in Bellevue, Washington. (Dries Decl. at ¶ 42.) Dries alleges the meeting lasted only a few minutes before Eskenazi "flew into a profanity-laced rage." (*Id.*; Rullman Decl. (Dkt. # 42), Ex. A at 13.)

---

[3] Eskenazi allegedly spoke with Clayton multiple times before March about progress on the Microsoft account and why it had not expanded beyond Sprinklr's relationship with Smith. (Griffin Decl., Ex. C at 142-144.) Eskenazi notes the plan and intent behind hiring Dries and assigning him to Microsoft was to generate "new business meetings" and "get new champions" within the account. (*Id.*) Under Dries leadership, Eskenazi testified he saw no progress on that plan. (*Id.*)

[4] From the record, it appears Voss was amongst Dries closest coworkers at Sprinklr. (Griffin Reply Decl. (Dkt. # 44-1), Ex. 1.) There are several texts in the record between the two concerning Dries' issues with Eskenazi and his plans for allegedly aiming to avoid termination by filing an HR complaint. (*Id.* at 2-5, 11-14; Griffin Reply Decl., Ex. 2 at 16-23.)

ORDER - 4

At the meeting, Eskenazi informed Dries that Clayton would take over leading the Microsoft Agreement renewal. (Griffin Decl., Ex. C at 152-53; Dries Decl. at ¶ 42).)

On May 22, 2019, the next day, Dries contacted Sprinklr human resources to discuss his concerns about Eskenazi. (Dries Decl. at ¶ 44; Griffin Decl., Ex. A at 51-54, Ex. K at 192-193.) Dries alleges he was diagnosed with depression and an anxiety disorder in 2017 and he takes prescription medications to manage his mental health. (Dries Decl. at ¶¶ 39, 44.) Because of his mental health concerns, Dries emailed Sprinklr Human Resources Director Simone Ruello (née Nielson) for help with Eskenazi. (*Id.* at ¶ 44, Ex. J at 86-87; Rullman Decl., Ex. D at 37.) On May 30, 2019, Dries and Nielson ended up sitting next to each other at a meeting in New York and Nielson agreed to talk with Dries about his concerns the next day (*Id.*) At that meeting, Dries was able to briefly inform Nielson about his concerns working under Eskenazi. (Dries Decl. at ¶ 45.) On June 7, 2019, Dries was able to fully inform Nielson he suffered from depression and an anxiety disorder and that his mental health was suffering based on his working relationship with Eskenazi. (*Id.* at ¶ 46.) Nielson allegedly told Dries she would investigate his concerns. (*Id.*)

On June 10, 2019, Eskenazi met with Dries, relayed to him he was underperforming on the Microsoft account, and removed Dries from the Microsoft account due to negative feedback. (Dries Decl. at ¶ 49, 55; Griffin Decl., Ex. A at, 55-56, Ex. C at 155.) On June 11, Dries sent Nielson a formal written complaint about Eskenazi in an attached PowerPoint deck detailing his concerns and the effect on his mental health. (Dries Decl. at ¶ 50, Ex. K at 91-155; Griffin Decl., Ex. A at 57-61, Ex. N at 203-267; Rullman Decl., Ex. D at 38.) On June 12, 2019, Nielson, Eskenazi, and Dries met. (Dries Decl. at ¶ 52.) Afterwards, Dries followed up with Nielson in mid-June and July but alleges there was no resolution of his complaints. (*Id*. at ¶¶ 54-54, Ex. L at

ORDER - 5

157, Ex. M at 159.) During the remainder of June-August 2019, Dries worked to close other deals in his book of business, including deals with LinkedIn and GitHub. (*Id.* at ¶ 58.)

On July 23, 2019, Clayton informed Dries the Microsoft Agreement was nearing close and that he had spoken with Eskenazi about making sure Dries was "taken care of on the deal." (Dries Decl. at ¶ 56, Ex. N at 162.) On July 24, 2019, Dries emailed Eskenazi regarding his compensation on the deal. (*Id.* at ¶ 57, Ex. O at 164.) Eskenazi responded Dries should not worry, and Nielson would "action the compensation piece" once the deal closed. (*Id.*)

On July 26, 2019, the Microsoft Agreement renewal closed. (Dries. Decl. at ¶ 56; Clayton Decl. at ¶ 11.) As part of the renewed agreement Microsoft agreed to a consolidation of its social media advertising through the Sprinklr Ads portal. (Dries Decl. at ¶ 56.) Smith allegedly stated to Clayton shortly after closing that the Agreement would not have happened but for Clayton's involvement. (Clayton Decl. at ¶ 11.)

On August 5, 2019, Dries again reached out to Nielson regarding his issues concerning Eskenazi. (Dries Decl. at ¶ 60, Ex. P at 166). On August 8, 2019, Dries relayed concerns to Nielson about not being paid a commission on the Microsoft Agreement. (*Id.* at ¶¶ 60-61.) At that time, Nielson allegedly informed Dries he was not owed on the Microsoft Agreement because he had been taken off the account, but she would look into it.[5] (*Id.*)

On August 20, 2019, Dries sent a message to Sprinklr's "On Target Earnings" group ("OTE"), an independent group within Sprinklr that addresses compensation concerns and

---

[5] Because Dries was not on the Microsoft account at the time of close, Sprinklr argues it properly did not pay Dries a commission on the deal. (Def.'s Mot at 8, 23, 25.) Sprinklr references the "clear terms" of its Variable Compensation Plan) and the incorporated Terms and Conditions Applicable to Sales, Success, and Services Incentive Plan, which require an employee to be part of the account team at close to qualify for a commission. (Griffin Decl., Ex. A at 95-97, Ex. F at 177-79, Ex. O at 269-95.)

ORDER - 6

disputes, alerting the group he had not been paid at least $174,611.80 in commissions for his involvement in the upsell portion of the Microsoft Agreement renewal. (Dries Decl. at ¶ 62, Ex. Q at 169.) Three days later, on August 23, 2019, Dries attended a call with Nielson and Eskenazi where he was informed his employment was being terminated. (Dries Decl. at ¶ 63; Griffin Decl., Ex. A at 97-98, Ex. C at 125-27.) At the meeting, Dries was told by Nielson that he was allegedly being let go due to negative customer feedback and Eskenazi relayed he was being fired for failing to prospect accounts. (*Id.*) Dries alleges he received no other negative feedback from Eskenazi, Ohls, Clayton, or anyone else at Sprinklr after he was removed from the Microsoft account. (Dries Decl. at ¶ 59; *see* Rullman Decl., Ex. A at 16, Ex. B at 25, Ex. D at 38.)

**B.    Spoliation of Evidence**

On September 6, 2019, Dries' former counsel, Jack Lovejoy, sent a demand letter to Sprinklr regarding Dries' claims. (Rullman Decl. at ¶¶ 5, 8).) On September 12, 2019, Dan Haley, Sprinklr's General Counsel, spoke with Lovejoy about the pending action. (*Id.*) On September 13, 2019, Nielson created an electronic summary concerning Dries for Sprinklr's legal team. (Rullman Decl., (Dkt. # 54) at ¶ 2.)

At her deposition on July 29, 2020, Nielson testified multiple times that she destroyed her HR notes concerning Dries sometime after December 31, 2019. (*Id.*, Ex. K at 98-99; Pl.'s Resp. at 16-17.) Nielson later corrected her deposition testimony to reflect: "If I had any notes in my notebook that was of any relevance to Joe Dries, it would have been typed up and included in the detailed electronic log that I prepared for Sprinklr's legal team in September 2019." (Rullman Decl., Ex. K at 98-99.) Dries alleges Sprinklr engaged in spoliation of evidence as a result of the

destruction of Nielson's notes and that her corrections to her deposition transcript were also improper. (Pl.'s Resp. at 16-17, 24-25.)

On August 31, 2020, Dries filed a Surreply. (Pl.'s Surreply (Dkt. # 48).) Dries' Surreply asks that Haley's declaration (dkt. # 46) be stricken as improper because it seeks to sanitize that Sprinklr failed to prevent Nielson from physically destroying her notes after Sprinklr was on notice of his claims. (Pl.'s Surreply at 2-3.)

At oral argument, this Court ordered Sprinklr to produce to Dries the electronic log Nielson prepared due to the destruction of her notes. (Dkt. ## 51, 52.) The Court additionally authorized the parties to supplement the record regarding the electronic log and the effect of the alleged spoliation on Defendant's Motion. (Min. Order (Dkt. # 52) at 1-2.) Dries' counsel indicated at oral argument a future motion would be filed regarding the spoliation issue. (Dkt. # 51.) Consequently, the Court reserves ruling on the spoliation issue at this time.

### III.   LEGAL STANDARDS

#### A.   Summary Judgment

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the Court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case or by establishing that the nonmovant

lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. It is the nonmoving party's responsibility to "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted source omitted). The Court need not "scour the record in search of a genuine issue of triable fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

## IV.   DISCUSSION

### A.   Disability Discrimination — Failure to Accommodate

The Washington Law Against Discrimination ("WLAD") prohibits employers from discharging an employee on the basis of a protected characteristic, including disability. RCW 49.60.180(2); *see Grill v. Costco Wholesale Corp.*, 312 F.Supp.2d 1349, 1354 (W.D. Wash. 2004). There are generally two types of disability discrimination claims under the WLAD: (1) disparate treatment; and (2) failure to accommodate. *Stewart v. Snohomish Cty. Pub. Util. Dist*

*No. 1*, 262 F.Supp.3d 1089, 1102 (W.D. Wash. 2017).[6] To sustain a failure to accommodate

claim under the WLAD, Plaintiff must show that: (1) he had a sensory, mental, or physical

abnormality that substantially limited his ability to perform the job; (2) he was qualified to

perform the essential functions of his job; (3) he gave his employer notice of his disability and

limitations; and (4) upon notice, his employer failed to affirmatively adopt measures available to

it and medically necessary in order to accommodate the disability. *Johnson v. Chevron U.S.A.,*

*Inc.*, 244 P.3d 438, 443 (Wash. App. Div. 1 2010); *Davis v. Microsoft Corp.*, 70 P.3d 126, 131

(Wash. 2003); *see also Wesley v. CBS Radio Servs.*, 2019 WL 4511930, at *9 (W.D. Wash. Sept.

19, 2019) (citing *Golafale v. Swedish Health Servs.*, 2016 WL 1367366, at *11 (W.D. Wash.

Apr. 5, 2016)).

Under RCW 49.60.040(7)(d), disability for reasonable accommodation purposes is

defined as:

> (d) Only for the purposes of qualifying for reasonable accommodation in
> employment, an impairment must be known or shown through an interactive
> process to exist in fact and:

> (i)  The impairment must have a substantially limiting effect upon the
> individual's ability to perform his or her job, the individual's ability
> to apply or be considered for a job, or the individual's access to
> equal benefits, privileges, or terms or conditions of employment; or

> (ii)  The employee must have put the employer on notice of the existence
> of an impairment, and medical documentation must establish a
> reasonable likelihood that engaging in job functions without an
> accommodation would aggravate the impairment to the extent that

---

[6] Dries solely proceeds on a failure to accommodate claim under the WLAD. (Compl. (Dkt. # 1-1) at
¶¶ 90-99; Pl.'s Response at 22-23). Sprinklr's Motion additionally argued Dries failed to satisfy the
requirements for disparate treatment and retaliation for disability-related protected activity. (Def.'s Mot. at
9-20.) However, because both claims were not plead in Dries' Complaint or addressed in his Response, the
Court will only address his failure to accommodate claim.

it would create a substantially limiting effect.

RCW 49.60.040(7)(d); *see Wesley*, 2019 WL 4511930 at *9 (citing *Studley v. The Boeing Co.*, 2016 WL 6298773, at *3 (W.D. Wash. Oct. 27, 2016)). Once the employer is aware of a disability that may require accommodation, the WLAD imposes a duty on the employer to engage in a good faith, interactive process with the employee to identify and provide reasonable accommodations. *Wesley*, 2019 WL 4511930 at *9 (citing *Golafale* 2016 WL 1367366 at *11)).

Sprinklr argues summary judgment should be granted on Dries' failure to accommodate claim because Dries never provided Sprinklr medical support demonstrating his alleged depression and anxiety "existed in fact" or that either impairment created a substantial limitation on his ability to perform his job. (Def.'s Mot. at 13-14.) As such, Sprinklr argues Dries fails to meet the definition of disabled under RCW 49.60.040(7)(d). (*Id.* at 16; Def.'s Reply at 6-7.) Dries counters summary judgment should be denied because Dries disclosed that he suffered from depression and anxiety to Nielson when he raised his initial complaints regarding Eskenazi and that Sprinklr failed to investigate or engage Dries in the interactive process afterwards. (Pl.'s Resp. at 2, 23-24.)

Based on the record before the Court, Dries fails to demonstrate that his mental health impairments had a substantially limiting effect upon his ability to perform his job, and therefore, fails to demonstrate he had a disability for reasonable accommodation purposes. Dries testified that his performance was "never an issue" at his deposition. (*See* Griffin Decl., Ex. A at 85-87; Dries Decl. at ¶ 58.) Dries also submits that during the remainder of June-August 2019, he was able to close difficult deals involving LinkedIn and GitHub. (Dries Decl. at ¶ 58.) Moreover, Dries never provided Sprinklr with official medical documentation establishing a reasonable likelihood that continuing to engage in his job functions without an accommodation would

aggravate his depression and anxiety to the extent it would create a substantially limiting effect. *See* RCW 49.60.040(7)(d). Instead, Dries chose not to identify his disabilities on his initial employment forms and Sprinklr was first put on notice to his impairments impacting his work based on his June 11, 2019 email to Nielson shortly after he was removed from the Microsoft account.[7] (*See* Griffin Decl., Ex. A at 80-82, Ex. E at 175, Ex. N at 203-267.)

Consequently, Dries fails to establish his disabilities substantially limited his performance under the first prong to sustain his failure to accommodate action. *See Opel v. Boeing Co.*, 2012 WL 1441405, at *4 (W.D. Wash. Apr. 26, 2012) (finding dismissal warranted where plaintiff failed to allege any substantial limitation on her ability to perform her job as a result of her substance abuse). Defendant is entitled to summary judgment on Dries' failure to accommodate claim.

**B.      Wrongful Discharge**

Wrongful discharge in violation of public policy has generally been limited to four situations: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." *De Jong v. Great Wolf Resorts, Inc.*, 2019 WL 2725536, at

---

[7] At oral argument, and in his supplemental briefing, Dries additionally raised that summary judgment should be precluded due to the spoliation of evidence issue concerning the destruction of Nielson's HR notes. (Dkt # 51; Pl.'s Resp. (Dkt. # 53) at 5.) However, because Dries fails to demonstrate his mental impairments had a substantially limiting effect on his ability to perform his job in the first instance, and because the contents of Nielson's notes would be irrelevant to determining if Dries was substantially limited by his mental impairments, the destruction of Nielson's HR notes does not preclude summary judgment on the failure to accommodate claim.

ORDER - 12

*4 (W.D. Wash. July 1, 2019) (quoting *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377 (Wash. 1996)); *see also Dicomes v. State*, 782 P.2d 1002, 1006-07 (Wash. 1989). The tort of wrongful discharge in violation of public policy is a narrow exception to the at-will doctrine. *Erickson v. Biogen, Inc.*, 417 F.Supp.3d 1369, 1386 (W.D. Wash. 2019) (citing *Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015)). The comprehensive scheme governing wages evidences Washington's "strong policy in favor of payment of wages due to employees." *See, e.g., Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 991 P.2d 1126, 1129-30 (Wash. 2000) (quoting *Schilling v. Radio Holdings, Inc.,* 961 P.2d 37, 374 (Wash. 1998)).

In Washington, to sustain an action for wrongful discharge for violation of public policy, the employee must demonstrate that: (1) their "discharge may have been motivated by reasons that contravene a clear mandate of public policy," and (2) "the public-policy-linked conduct was a significant factor in the decision to discharge" them. *Martin v. Gonzaga University*, 425 P.3d 837, 842-43 (Wash. 2018); *see De Jong*, 2019 WL 2725536 at *4. If plaintiff presents a prima facie case, the burden shifts to the employer to produce evidence of legitimate, nonretaliatory reason for the discharge. *Martin*, 425 P.3d at 842-43. If the employer does so, the burden shifts back to the plaintiff to show that the reason is pretextual, or despite the employer's legitimate reason, the public-policy-linked conduct nevertheless is a substantial factor motivating the discharge. *Id.*

Pretext may be shown with evidence that: (1) the reasons given have no basis in fact; (2) even if the reasons are based in fact, the employer was not motivated by these reasons; or (3) the reasons are insufficient to motivate an adverse employment decision. *Hollenback v. Shriners Hosps. for Children*, 206 P.3d 337, 345 (Wash. App. Div. 3 2009). Timing alone is generally insufficient to prove pretext. *See e.g., Lawler v Montblanc N. Am., LLC*, 704 F.3d 1235, 1244

1   (9th Cir. 2013); *Hooker v. Parker Hannifin Corp.*, 548 Fed.App'x. 368, 370 (9th Cir. Nov. 2,

2   2013). However, the Ninth Circuit has previously found timing highly probative in determining

3   pretext, and that in some cases "causation can be inferred from timing alone where an adverse

4   employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air,*

5   *Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002); *see also Stegall v. Citadel Broad. Co.*, 350 F.3d 1061,

6   1069 (9th Cir. 2003) ("Although we have refused to infer causation from timing alone . . . we

7   have found timing highly probative even when the period between the employee's complaints

8   and adverse action far exceeded the [nine-day] time interval in [plaintiff's] case.") (internal

9   citations omitted).

10        Sprinklr argues Dries' wrongful discharge claim should be dismissed because Sprinklr

11   terminated Dries for performance reasons. (Def.'s Mot at 2, 20-21.) Sprinklr generally argues:

12   (1) it hired Dries expressly to lead the sales component for its Microsoft contract; (2) Microsoft

13   asked Sprinklr to remove Dries from the account; and (3) Eskenazi recommended termination

14   two months prior to Dries requesting a commission. (*Id.*) Therefore, Sprinklr contends Dries'

15   poor performance is evidence of a legitimate, nonretaliatory reason for discharge and Dries

16   cannot show pretext. (*Id.* at 21.) Dries counters that Sprinklr fired him three days after he filed

17   his commission complaint and that this was Sprinklr's primary motivation for terminating his

18   employment. (Pl.'s Resp. at 2, 18-20.) Dries additionally argues he met all his employment

19   expectations over the following weeks after he was taken off the Microsoft account, which

20   included closing significant deals with LinkedIn and GitHub. (*Id.*)

21        In this case, Dries has properly alleged a prima facie case he was discharged for reasons

22   that contravene a clear mandate of public policy—the payment of wages/commission owed—and

23   that it was a significant factor in his firing. The undisputed facts demonstrate Dries was taken off

ORDER  - 14

the Microsoft account in June 2019, a few days before the original closing date, and roughly six weeks prior to its actual closing. (*See* Dries Decl. at ¶¶ 49, 55-56, Ex. N at 162; Griffin Decl., Ex. A at, 55-56, Ex. C at 155.) Despite—as Sprinklr contends—having cause to fire Dries at that time, Dries was kept on and finalized deals with LinkedIn and GitHub. (*See* Dries Decl. at ¶ 58.) Dries reached out to Nielson at the beginning of August 2019 regarding his commission on the Microsoft account after having been assured by both Clayton and Eskenazi he we would be "taken care of" only to be told he would not be receiving a commission because he was not on the account at closing per Sprinklr policy. (*See* Dries Decl. at ¶¶ 56-57, 60, Ex. O at 164, Ex. P at 166.) Dries subsequently sent a formalized complaint to Sprinklr's OTE group on August 20, 2019, and was fired three days later on August 23, 2019. (*See* Dries Decl. at ¶¶ 62-63, Ex. Q at 169; Griffin Decl., Ex. A at 97-98, Ex. C at 125.) Given the circumstances of Dries termination and this timeline of events, Dries has made prima facie showing he was discharged due to his commission request.

Next, the burden shifts to Sprinklr to produce evidence of legitimate, nonretaliatory reason for Dries discharge. *See Martin*, 425 P.3d at 842-43. Here, Sprinklr has produced evidence that Dries termination was due to his underperformance on the Microsoft account, including deposition and declaration evidence from several Sprinklr employees that Smith made it clear he wanted Dries off the Microsoft account. (*See* Dries Decl. at ¶ 63; Griffin Decl., Ex. A at, 55-56, Ex. C at 155; Mara Decl. at ¶¶ 5-8; Blankenship Decl. at ¶¶ 4-6; Clayton Decl. at ¶¶ 6-11.) Eskenazi additionally determined Dries was underperforming on his objective sales metrics by March 2019. (*See* Griffin Decl., Ex. A at, 55-56, Ex. C at 142-44, 155.)

At this juncture, the burden shifts back to Dries to show Sprinklr's performance-based reason is pretextual, or despite Sprinklr's legitimate reason to fire, the public-policy-linked

1   conduct nevertheless was a substantial factor motivating his discharge. *See Martin*, 425 P.3d at

2   842-43. Here, as previously explored above, Dries has demonstrated his commission request was

3   likely a substantial factor motivating his discharge based on the timing of his termination. *See*

4   *Stegall*, 350 F.3d at 1069; *Villiarimo*, 281 F.3d at 1065. Furthermore, Dries' deposition evidence

5   submitted in the record indicates he did not receive any negative feedback from anyone at

6   Sprinklr after he was removed from the Microsoft account. (Dries Decl. at ¶ 59; *see* Rullman

7   Decl., Ex. A at 16, Ex. B at 25, Ex. D at 38.) Eskenazi acknowledged that he had did not have

8   concerns about Dries' performance in August 2019. (*See* Rullman Decl., Ex. A at 16). Ohls

9   noted he did not have any negative interactions with Dries after he was removed from the

10  Microsoft account and that he did not recall making the recommendation to terminate Dries'

11  employment based on the negative feedback Dries received on the Microsoft account. (*See id.*,

12  Ex. B at 24-25.) Nielson also testified she did not receive any concerns about Dries' performance

13  after he was removed from the Microsoft account. (*See id.*, Ex. D at 38.) Finally, Dries also

14  plausibly asserts Sprinklr's motivation to terminate may have been to shift money owed to him

15  on the Microsoft deal over to Clayton because Eskenazi had previously recommended Clayton

16  receive compensation on the Microsoft deal despite being demoted at that time. (*See id.*, Ex. F at

17  46-47.)

18          Based on the record before the Court and the timeline of events, there remain several

19  genuine issues of material fact concerning whether Dries' termination was motivated based on

20  his commission request, precluding the grant of summary judgment on this claim.

21          **C.      Breach of Contract**

22          Under Washington law, the formation of a contract requires a meeting of the minds

23  between the parties to the contract. *Sea-Van Invs. Assocs. v. Hamilton*, 881 P.2d 1035, 1038-39

(Wash. 1994); *Blue Mt. Constr. Co. v. Grant Cty. Sch. Dist. No. 150-204*, 306 P.2d 209, 212 (Wash. 1957) ("The acceptance of an offer is always required to be identical with the offer, or there is no meeting of the minds and no contract."). To prevail on a claim for breach of contract in Washington, a plaintiff must generally show: (1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damages. *See, e.g. Rivera v. Peri & Sons Farm, Inc.*, 735 F.3d 892, 899 (9th Cir. 2013); *Storti v. Univ. of Wash.*, 330 P.3d 159, 163 (Wash. 2014). Washington follows the objective manifestation theory of contracts, which "lays stress on the outward manifestation of assent made by each party to the other. The subjective intention of the parties is irrelevant." *City of Everett v. Sumstad's Estate*, 631 P.2d 366, 367 (Wash. 1981) (citing *Plumbing Shop, Inc. v. Pitts*, 408 P.2d 382, 384 (Wash. 1965)).

In this case, the relevant portion of Dries' Terms and Conditions Applicable to Sales, Success, and Services Incentive Plan ("Terms") states:

> IV. Plan Administration: The Company acting in its sole and absolute discretion, will have the full power and authority to interpret the provisions of the Plan, to supervise the administration of the Plan, and to take such other action as it deems necessary and desirable in order to carry out the provisions of the Plan. The Company reserves the right to terminate or suspend the Plan, including, without limitation, payments of Commissions or Bonus for a Participant *for any justifiable reason . . . .*
>
> . . .
>
> VI. At-Will Employment (Only Applicable to US Based Employees): The Plan is not *. . . a contract of any kind, nor do these guidelines set forth in the Plan alter the at-will nature of any sales or Service Professionals' employment relationship with the Company.*

(Griffin Decl., Ex. O at 136-137 (emphasis added).) The Terms further provide: "All determinations and decisions made by the Company or the Sales Compensation Committee in administering the Plan shall be final, conclusive and binding on all Participants." (*Id.*, Ex. O at 136-37.) Section X(2)(iv) of the Terms additionally states: "[Sprinklr] reserves the right to

ORDER  - 17

change the assignment of a territory or account at any time . . . . In such situations . . . the Sales

Professional will no longer qualify for continued commissions on the accounts . . . unless

otherwise approved by the Sales Compensation Committee." (*Id.*)

Sprinklr argues it did not breach a contract because disclaimers included in Dries'

Variable Compensation Plan ("VCP"), which expressly incorporated the Terms by reference,

were clear and unequivocal that Sprinklr did not assent to form a contract. (Def.'s Mot. at 23-24.)

Dries counters that although they were not stand-alone contracts, Dries VCP and Terms were

also incorporated into his offer letter, which Dries argues is a valid contract, and Sprinklr's

failure to pay Dries a commission on the Microsoft Agreement constituted a breach. (Pl.'s

Response at 23.)

Here, Dries fails to demonstrate the existence of a valid contract. The record is clear

Dries' incentive compensation was determined by his VCP and the Terms. (*See* Griffin Decl.,

Ex. O at 136-37.) Disclaimers included in his Terms evidence that the parties did not intend to

form a valid contract or alter the at-will nature of Dries employment. *See id.* ("The Plan is

not . . . a contract of any kind, nor do these guidelines set forth in the Plan alter the at-will nature

of any sales or Service Professionals' employment relationship with the Company.") And despite

Dries' contention his offer letter in conjunction with the VCP and Terms formed a valid contract,

Dries' offer letter also clearly disclaimed it intended to form a contract. (*See* Dries Decl., Ex. A

at 21 ("Neither this letter nor any other communication, either written or oral, should be

construed as a contract . . . .").)

As a side note, even if the Court were able to find a valid contract was formed, the

language included in the VCP and Terms gave Sprinklr absolute discretion to deny Dries a

commission for any "justifiable reason," which would include having been taken off the

ORDER - 18

Microsoft account due to performance issues as Sprinklr alleges. (*See* Griffin Decl., Ex. O at 136-37.) Therefore, Defendant is entitled to summary judgment on Dries' breach of contract claim.

### D.    Wage Claims

Under the Wage Payment Act ("WPA"), an employer need only pay an employee wages "due him on account of his employment." RCW 49.48.010. The term "wages" has been held to include commissions. *Int'l Assoc. of Fire Fighters, Local 46 v. City of Everett*, 42 P.3d 1265, 1268 (Wash. 2002).Washington's Wage Rebate Act ("WRA") provides that an employer who, "[w]illfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract" "shall be liable in a civil action by the aggrieved employee."[8] RCW 49.52.070.

With respect to compensation involving commissions, Washington courts follow the "procuring cause" rule that holds  when a party is employed to procure a purchaser to whom a sale is eventually made, he is entitled to a commission regardless of who makes the sale if he was the procuring cause of the sale. *Miller v. Paul M. Wolff Co.*, 316 P.3d 1113, 116 (Wash. App. Div. 3 2009) (citing *Willis v. Champlain Cable Corp.*, 748 P.2d 621, 625 (Wash. 1998)); *see also Singleton v. Intellisist, Inc.*, 2018 WL 2113973, at *4 (W.D. Wash. May 8, 2018). A sales executive is the procuring cause or agent when he sets in motion the series of events

---

[8] Regarding willfulness, an employer does not willfully withhold wages within the meaning of RCW 49.52.070 where it has a bona fide belief that it is not obligated to pay them. *Schilling v. Radio Holdings, Inc.,* 961 P.2d 371, 378 (Wash. 1998). Determining willfulness is generally a question of fact. *Pope v. University of Washington,* 852 P.2d 1055, 1062 (Wash. 1993).

culminating in a sale. *Roger Crane & Assoc., Inc. v. Felice*, 875 P.2d 705, 709 (Wash. App. Div. 3 1994) (internal citation omitted). The determination of whether a sales executive was the procuring cause of a sale is generally a question of fact. *Id.* However, if reasonable minds can reach but one conclusion, it may be determined as a matter of law. *Id.*

The procuring cause rule does not apply where "a written contract provides the manner by which termination can be effected as well as how commissions will be awarded when an employee or agent is terminated." *Willis*, 748 P.2d at 625. However, "[i]n the absence of a contractual provision specifying otherwise, the procuring cause doctrine acts as a gap filler." *Syputa v. Druck, Inc.*, 954 P.2d 279, 283 (Wash. App. Div. 1 1998) (citing *Indus. Rep., Inc. v. CP Clare Corp.*, 74 F.3d 128 (7th Cir. 1996)). Washington courts are "reluctant" to apply "the procuring cause rule to cases involving a clearly written employment contract." *Mr. 99 & Associates, Inc. v. 8011, LLC*, 197 Wash.App. 1021, 1028 (Wash. App. Div. 1 2016) (quoting *Willis*, 748 P.2d at 626).

Sprinklr argues it did not deny Dries any wages due to him under the WPA or WRA because, under the terms of Dries' VCP and the Terms, Sprinklr had the right to withhold a commission under any "justifiable reason" such as inadequate performance. (Def.'s Mot. at 23-24.) Sprinklr additionally argues procuring cause doctrine does not apply here because Clayton primarily drove the Microsoft Agreement renewal. (Def.'s Reply at 7-9.) Dries counters that he was the procuring cause for the Microsoft upsell at the very least, entitling him to a commission, and that procuring cause doctrine applies in absence of a contract. (Pl.'s Resp. at 2, 21.)

Because the VCP and Terms did not form a valid contract, as previously discussed above, procuring cause doctrine applies as a gap filler. *See Syputa,* 954 P.2d at 283. Here, Dries has

plausibly demonstrated under the procuring cause rule that, because he was the individual who was employed to procure Microsoft to renew, and because that deal was eventually made, he is entitled to a commission. *See Miller*, 316 P.3d at 1113; *Singleton*, 2018 WL 2113973 at *4. Dries arguably set in motion the series of events resulting in the renewal of the Microsoft Agreement and Dries contends that he was responsible for the upsell component. *See Felice,* 875 P.2d at 709. However, there are several genuine issues of material facts as to Dries' specific efforts because both parties have set forth competing evidence disputing the extent his efforts ended up in the final Microsoft Agreement or if the deal was only completed due to the efforts of Clayton. (Dries Decl. at ¶ 56; Clayton Decl. at ¶ 11.) Accordingly, Dries' wage claims are not appropriate for dismissal on summary judgment.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion (Defs.' Mot. (dkt. # 35)) is GRANTED in part and DENIED in part as follows:

> (1)     Defendant's Motion is GRANTED on Plaintiff's claim for disability discrimination due to a failure to accommodate and Plaintiff's breach of contract claim.

> (2)     Defendant's Motion is DENIED on Plaintiff's claim for wrongful discharge, in violation of public policy, and Plaintiff's claims pursuant to the Wage Payment Act (RCW 49.48) and Wage Rebate Act (RCW 49.52.050).

> (3)     The Clerk is directed to send a copy of this Order to the parties.

DATED this 16th day of October, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge

ORDER - 22